15276

STEPHENSON MULE COMPANY v. POWELL *ET AL.*

(15 S. E. (2d), 389)

September, 1939.

*Mr. James E. Leppard* of Chesterfield, S. C., counsel for appellant,

*Mr. John Nock* of Cheraw, S. C., counsel for respondents,

Counsel for appellant, in reply,

June 6, 1941.

The opinion of the Court was delivered by CIRCUIT JUDGE T. S. SEASE, ACTING ASSOCIATE JUSTICE:

On or about February 27, 1934, Stephenson Mule Company, the appellant, delivered to the respondents, as Receivers of Seaboard Air Line Railway Company a shipment of twenty-five mules and one horse to be transported from Atlanta, Georgia, to Chesterfield, South Carolina. The shipment arrived at Chesterfield on March 1, 1934, and was delivered to appellant on that date. Upon arrival two of the mules were sick, and according to claim subsequently filed by appellant with respondents one of them died on March 9, 1934, and the other on March 12, 1934. The claim of appellant having been declined, this action was instituted in the Court of Common Pleas of Chesterfield County on or about December 19, 1934, to recover the sum of $263.19, the alleged value of the two mules with freight charges paid. Upon the trial of the case a verdict was directed in favor of the respondents, and this appeal ensued.

Respondents had two trains daily by which the shipment could be forwarded from Atlanta, one leaving at six o'clock in the morning and the other during the early afternoon. The first train made a connection at Hamlet, North Carolina, by which the shipment could reach Chesterfield, South Carolina, at approximately midday on the following day without the necessity of unloading en route for rest, water and feeding for a period of at least five consecutive hours, as required by the Act of Congress regulating the care of animals in transit, 45 U. S. C. A., § 71. Use of the second train necessitated unloading at Hamlet in order to comply with the Act of Congress, so that a shipment leaving by the second train on February 27, could not reach Chesterfield until about midday on March 1. The bill of lading issued by respondents for appellant's shipment is dated February 27, 1934, but appellant claims that the shipment was delivered to respondents at about one o'clock in the afternoon of February 26, with instructions to forward it by the train leaving at six o'clock on the following morning, February 27, so as to avoid the delay entailed by the necessity of unloading at

Hamlet for rest, water and feeding if forwarded by the later train. Actually however, the shipment was forwarded on the second train, which left at two o'clock in the afternoon of February 27, and arrived at Hamlet at 1 :15 p. m., on February 28, too late to make a connection through to Chesterfield until next morning, March 1, and necessitating unloading at Hamlet for rest, water and feeding as required by the Act of Congress.

When the shipment failed to arrive at Chesterfield during the morning on February 28, Mr. Stephenson, appellant's president and general manager, in response to inquiry by telephone of respondents' agent at Cheraw, was informed that it had reached Hamlet and had been unloaded at that point. During the afternoon Mr. Stephenson went to Hamlet, reaching there about four o'clock, and the shipment had not then been unloaded, but it was later unloaded in Mr. Stephenson's presence at about five o'clock. According to Mr. Stephenson's testimony, the unloading pens at Hamlet were about half covered and open on three sides, so as to expose the unloaded stock to the weather, and he also says it was snowing and sleeting at the time. He also further states that when the mules were unloaded at Hamlet one of them walked "soft-footed" and was foundered, and that another was having a chill and was taking cold. On arrival at Chesterfield the next day, March 1, the mule that walked "soft-footed" and was foundered at Hamlet had to be helped from the car and subsequently died. The mule that was having a chill and was taking cold at Hamlet died some days later, on March 12, and an autopsy showed some light bruises on the ribs and also pneumonia and some symptoms of meningitis.

These are the two mules for the loss of which this action has been brought, and while the complaint bases the right to recover merely upon the general allegation that "the defendants did not safely carry and deliver said livestock, pursuant to its agreement," yet the testimony and the briefs of coun-

sel indicate that aside from the presumption arising out of receipt by a carrier of a shipment in good condition and delivery to the consignee in bad condition, later to be referred to, the right to recover is based in substance wholly upon the failure to forward the shipment by the train leaving Atlanta at six o'clock on the morning of February 27, thereby necessitating unloading at Hamlet and exposure to severe weather conditions on account of the alleged inadequacy of the unloading facilities and shelter at Hamlet.

The shipment being an interstate shipment moving under the uniform livestock bill of lading, duly filed with and approved by the Interstate Commerce Commission, the provisions of the contract evidenced by this bill of lading are binding upon the parties, and even if appellant gave respondents previous verbal instructions on February 26, to ship by a particular train, yet the written contract subsequently made on February 27, as evidenced by the bill of lading, expressly provided that the carrier was not bound to transport the livestock by any particular train. It would, therefore, seem obvious that liability could not be rested upon the mere failure to forward the shipment by the train leaving Atlanta at six o'clock on the morning of February 27, in the face of the express stipulation against liability for failure to transport by any particular train. The only claimed assent by respondents to appellant's direction to send the shipment out by the six o'clock train on the morning of February 27, is the mere failure to refuse or mere silence on the part of the agent in response to the alleged direction, and even if this most unsatisfactory and equivocal oral evidence of the making of a different contract could be deemed reasonably sufficient to override the formal written contract evidenced by the bill of lading issued under date of February 27, still the record does not disclose any evidence sufficient to show that the failure to ship by the early train of February 27, was a proximate cause of the death of appellant's mules. It is, therefore, apparent in any event that the failure

to forward appellant's mules by the train leaving Atlanta at six o'clock on the morning of February 27, does not entail liability upon respondents.

It is also equally apparent that liability cannot be based upon the alleged inadequacy of the unloading facilities and shed and the consequent exposure of the livestock at Hamlet, because all of the testimony, including that of Mr. Stephenson, appellant's president and general manager, is clearly to the effect that the two mules were already sick when they reached Hamlet, and at best the real cause of the mules contracting the diseases from which they died is a matter of conjecture.

Adverting to the presumption above referred to, there can be no doubt as to the general rule that when a shipment is delivered in good order to a carrier for transportation, and it is delivered to the consignee in damaged condition, a presumption arises that the damage occurred during transportation, thereby casting the onus upon the carrier to disprove fault; but as said in *Gramling Electric Refrigeration v. Southern Railway Co.*, 155 S. C., 394, 152 S. E., 670, 671, in discussing this presumption: "The primal element in the presumption is the delivery for shipment of a commodity then in good condition. In the absence of evidence of this primal element the presumption cannot attach." It may well be doubted in this case if there is any evidence at all as to even the apparent condition of the mules when delivered to respondents for transportation. It is true that Mr. Stephenson, appellant's president and general manager, testified that the mules were examined by a veterinarian before they were loaded, and that the veterinarian's certificate is required to be delivered with livestock at the time of delivery for shipment, yet the record is wholly silent as to result of the examination by the veterinarian or as to what the certificate showed as to the condition of the mules, and there is no other testimony on the subject. If it be assumed, however, from this veterinarian's examination and certificate

and from the issuance of a bill of lading without noting any exception, that as far as their condition was apparent on inspection the mules were in good condition, appellant still falls short of making out a case against respondents justifying submission to a jury.

If these mules had died as a result of some physical injury apparent upon inspection, doubtless the fact of the veterinarian's examination and certificate, even though the record is silent as to the result of the examination and as to the contents of the certificate, when taken in connection with the issuance of a bill of lading without noting any exception as to the condition of the mules, would be some evidence that such visible physical injury did not exist at the time of delivery to the carrier but occurred during its custody, thereby making an issue for the jury as to the carrier's liability. Both of these mules, however, died from sickness and not as a result of some visible physical injury apparent upon inspection. It is true that there is testimony to the effect that one of the mules had some light bruises on his ribs, but this was not visible from inspection, and was only disclosed by an autopsy performed after the death of the mule, which occurred twelve days after delivery to the consignee. If these bruises had anything to do with the death of the mule, as to which there is no evidence, so far as the record discloses they could have very well existed at the time of delivery to the carrier, or they could just as well have occurred during the twelve days that the mule was in the hands of the consignee after the termination of the shipment.

Assuming that the mules appeared to be in good condition when received for transportation, still there is no reasonable ground for dispute that they died of sickness, and there being no testimony tending to show that this sickness was contracted as a result of any negligence of the carrier, no liability can attach to the respondents. The applicable rule is thus stated in *Sweeney v. Southern Railway Co.,* 165 S. C., 380, 163 S. E., 838, 840:

"The principles governing this case appear, it seems to us, well expressed in the case of *Hussey v. The Saragossa,* 3 Woods, 380, 12 Fed. Cas., 1066, No. 6949, where, under very similar facts, it was said: 'The rule of law is, that when the carrier fails to deliver goods, or when he delivers goods in a damaged condition, the onus is cast upon him to show that he is not in fault. In other words, loss or injury is sufficient proof of negligence or misconduct, or of the intervention of human agency, and when shown, the burden is on the carrier to exempt himself. Ang. Carr. § 202; Story, Bailm. § 329; Code Ga. § 2066. But the shipper must show an injury to the article shipped before the burden is cast upon the carrier to exonerate himself. Is an injury shown when the article shipped is a horse or other live stock, which is proved to have been delivered to the carrier in good health and condition, and to have been re-delivered to the shipper in a sick and debilitated condition, but without any fractures, wounds, abrasions, or other external or visible injury? I think not. As well might a passenger who embarks in good health claim to support an action for damages against the common carrier, by simply showing that when he disembarked at the end of his voyage he was in a sick and debilitated condition.

" 'The liability of a common carrier of animals is not in all respects the same as that of a carrier of inanimate property. *For instance, he is not an insurer against injuries arising from the nature and propensities of the animals and which diligent care could not prevent. He is not liable for injuries by disease contracted without his fault* after the stock is delivered to him. On the same principle, proof of the decay of perishable fruit committed to a common carrier, would· not of itself be sufficient to charge him. (Citing cases.) When the damage to the thing shipped is apparently the result of its inherent nature or inherent defects, the shipper must show something more than its damaged condition before the carrier can be called on to explain. He must show some injury to the thing shipped which can not be the

result of its inherent nature or defects, before the burden is cast upon the carrier to show that he is not in fault. * * * ' (Italics ours.)

\* \* \*

"In the article on 'Carriers' in Ruling Case Law, the recognized principles are thus stated: 'Where the injury is physical a shipper will satisfy the rule requiring him to show an injury to his stock before the burden is cast on the carrier to exonerate itself, by establishing that the stock were delivered in good health and condition and redelivered by the carrier in an injured condition, but *where the injury claimed is sickness a shipper does not satisfy the rule unless he goes further and shows that the illness was contracted as a result of the negligence of the carrier.*' (Italics ours.) 4 R. C. L., 993."

Under no possible view of the case was there any issue to submit to the jury, and the Circuit Judge correctly directed a verdict for the defendants-respondents.

Affirmed.

MR. CHIEF JUSTICE BONHAM and MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE, and STUKES concur.